UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TARA BENNETT and EDWARD POLHILL, individually and on behalf of all others similarly situated,<br><br>                      Plaintiffs,<br><br>    v.<br><br>T-MOBILE USA, INC.,<br><br>                      Defendant. | CASE NO. 2:22-cv-01805-LK<br><br>ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY CASE |

This matter comes before the Court on Defendant T-Mobile USA, Inc.'s Motion to Compel Arbitration and Stay Case. Dkt. No. 14. Plaintiffs Tara Bennett and Edward Polhill oppose the motion. Dkt. Nos. 20, 28. For the reasons stated herein, the Court grants T-Mobile's motion.[1]

## I.   BACKGROUND

Plaintiffs Tara Bennett and Edward Polhill initiated this putative class action seeking relief "on behalf of all T-Mobile customers [who] have been the victim of SIM swap fraud." Dkt. No. 1

---

[1] Because the Court can decide the matter based on the parties' filings, it denies T-Mobile's request for oral argument.

at 1, 5.[2] A SIM-swap is a form of "account takeover fraud" whereby a third party "is allowed to transfer access to a customer's wireless phone number from the customer's registered 'subscriber identity module' card (or 'SIM card') to a SIM card controlled by the third party." Dkt. No. 1 at 3 (footnote omitted); *see id.* at 11–12. As a result of T-Mobile's alleged failure to prevent third parties from gaining access to customer information in this fashion, Plaintiffs allege that they "have lost millions of dollars" and that "T-Mobile customers continue to suffer repeated instances of identity theft." *Id.* at 2; *see also id.* at 4, 18–21. On behalf of themselves and a putative class, Plaintiffs assert six causes of action under federal statute and state common law and request monetary, injunctive, and declaratory relief, including a judgment declaring that T-Mobile's arbitration clause is unenforceable. *Id.* at 26–44.[3]

T-Mobile maintains that Plaintiffs' claims are subject to mandatory arbitration. Dkt. No. 14 at 8; *see* Dkt. No. 26 at 3. However, in its initial motion to compel arbitration and stay the case, T-Mobile noted that it lacked the necessary information to confirm Bennett's identity as a T-Mobile customer. Dkt. No. 14 at 9 & n.2. Accordingly, despite contending that both Polhill and Bennett were required to arbitrate their claims pursuant to applicable terms and conditions ("T&Cs"), *id.* at 9, 26, T-Mobile acknowledged that it had not been able to locate Bennett's account information to "identify the specific arbitration agreements [she] entered into," *id.* at 26; *see* Dkt. No. 16 at 1–2. T-Mobile therefore asked the Court either to compel Bennett to arbitrate her claims for the same reasons as Polhill, or alternatively, to compel Bennett to provide it with

---

[2] A third named Plaintiff, David Garcia, voluntarily dismissed his claims against T-Mobile. Dkt. No. 25.

[3] Plaintiffs' six causes of action are as follows: (1) declaratory relief under the Declaratory Judgment Act, 28 U.S.C.§ 2201, as to the validity of T-Mobile's arbitration agreement, Dkt. No. 1 at 26–28; (2) violations of the Federal Communications Act, 47 U.S.C. § 151 *et seq.*, and its corresponding regulations, Dkt. No. 1 at 28–33; (3) negligence, *id.* at 33–36; (4) negligent hiring, retention, and supervision, *id.* at 36–38; (5) breach of contract and the implied covenant of good faith and fair dealing, *id.* at 38–40; and (6) violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Dkt. No. 1 at 40–41.

ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY CASE - 2

identifying information such as her billing account number or telephone number. Dkt. No. 14 at 26; *see also* Dkt. No. 21 at 6, 17.

On May 11, 2023, the Court deferred ruling on the portion of T-Mobile's motion seeking to compel arbitration and stay the case and granted the portion of its motion seeking to compel discovery, ordering Plaintiffs to provide T-Mobile with the billing account number(s) and telephone number(s) for Bennett. Dkt. No. 24 at 4. The Court further ordered the parties to file supplemental briefs following this limited discovery. *Id.* at 4–5. Thereafter, the parties filed supplemental briefs regarding Bennett's purported agreement with T-Mobile. Dkt. Nos. 26, 28. The Court also subsequently ordered T-Mobile to provide charts comparing the material provisions in each version of the Metro and T-Mobile T&Cs relevant to this dispute and granted both parties the opportunity to address whether any differences in the T&Cs might bear on their dispute. Dkt. No. 29; *see also* Dkt. Nos. 30, 33–35 (the parties' responses).[4]

Based on the current record, the Court provides a brief overview of Bennett's and Polhill's alleged agreements with T-Mobile.

A.    **Bennett and T-Mobile**

1. Bennett's T-Mobile Account

As part of its supplemental briefing, T-Mobile submitted a declaration of T-Mobile's records custodian, Christopher Muzio, indicating that Bennett's phone number was activated with T-Mobile on or about May 20, 2019, under an account opened in 2016 by Diego Szteinhendler. Dkt. No. 27 at 2; *see also id.* ("T-Mobile's records reflect that Mr. Szteinhendler added Tara

---

[4] The parties' responses to the Court's order mainly rehash their prior arguments on the pending motion rather than analyze the import of potential discrepancies in the applicable T&Cs. *See generally* Dkt. Nos. 33–34. Although other arguments could have been made, the Court follows the principle of party representation and relies on the parties' framing of the issues. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579, (2020); *see also Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 825 F. App'x 440, 442 (9th Cir. 2020). The Court has thoroughly reviewed each of the parties' submissions in deciding this motion.

Bennett as an authorized user on the Szteinhendler Account on February 22, 2022."); Dkt. No. 27-1 at 2. T-Mobile also submitted a signed receipt for an Apple iPhone associated with Bennett's number purchased in a T-Mobile store in New York City, as well as a signed Equipment Installment Plan ("EIP") for the device, both of which included notice of the T&Cs and arbitration. Dkt. No. 27 at 3–4; Dkt. No. 27-6 at 2–3 (signed iPhone receipt); Dkt. No. 27-7 at 2–10 (signed EIP).

  2. <u>T-Mobile's T&Cs</u>

  Though T-Mobile updated its T&Cs at least three times since Bennett began using her phone line, Muzio declares that "the arbitration provisions have not changed in a way material to this dispute." Dkt. No. 27 at 3; *see* Dkt. Nos. 27-1–27-5. In its supplemental briefing, T-Mobile cites to the March 1, 2021 version of the T&Cs "[f]or convenience" and because they were "the latest version before this action was initiated." Dkt. No. 26 at 4 n.1; *see* Dkt. No. 27-5 at 2–34; Dkt. No. 34 at 6–7 (summarizing the throughlines of the various version of the T-Mobile T&Cs). The March 2021 version of the T&Cs states that customers can accept the terms of the agreement by taking any number of actions:

> **HOW DO I ACCEPT THESE T&CS?**
> You accept these T&Cs by doing any of the following things:
>
> - giving us a written or electronic signature or confirmation, or telling us orally that you accept;
> - activating, using or paying for the Service or a Device; or
> - opening the Device box.
>
> If you don't want to accept these T&Cs, don't do any of these things.

Dkt. No. 27-5 at 2–3. The T&Cs also contain dispute resolution and arbitration sections that allow for a 30-day opt-out window for new customers. *Id.* at 4–7. Notably, the 2021 T-Mobile T&Cs state in relevant part:

> <u>**Dispute Resolution and Arbitration**</u>**. YOU AND WE EACH AGREE THAT,**

**EXCEPT AS PROVIDED BELOW, ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, OUR SERVICES, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT.**

*Id.* at 4–5; *see also id.* at 2 ("Thanks for choosing T-Mobile. Please read these Terms & Conditions ('T&Cs'), which contain important information about your relationship with T-Mobile, including mandatory arbitration of disputes between us, instead of class actions or jury trials. You will become bound by these provisions once you accept these T&Cs.").

**B.    Polhill and MetroPCS**

1.    Polhill's MetroPCS Account

T-Mobile provides wireless telecommunication services through several brands, including prepaid wireless phone plans under the "Metro by T-Mobile" moniker following its 2013 merger with MetroPCS Communications, Inc. Dkt. No. 14 at 9 & n.1; Dkt. No. 15 at 2.

In December 2013, Polhill activated a Metro wireless services account and made at least 125 payments between then and December 2022. Dkt. No. 15 at 2, 5. Muzio avers that at all relevant times, Metro's standard practice and procedure was "to provide a customer activating service with information about Metro's Terms and Conditions, including information that the Terms and Conditions require arbitration of disputes, and that a customer would accept the Terms and Conditions by activating, using, or paying for Metro services." *Id.* at 3; *see also id.* at 4 ("At all relevant times, it has been (and still is) Metro's standard practice and procedure to provide information about Metro's Terms and Conditions to a customer activating service."). More specifically, Metro's standard practice and procedure in 2013 included providing a one-page sheet explaining relevant policies and terms (the "Metro Information Sheet"). *Id.* at 4; *see* Dkt. No. 15-10 at 2–3. Metro's standard practice and procedure then (and now) also involved affixing a sticker

mentioning the T&Cs on Metro device boxes that must be removed in order to open the box (the "Metro Box Sticker"). Dkt. No. 15 at 4. The Metro Box Sticker states in relevant part:

> By purchasing or opening this package, activating, using, or paying for Metro by T-Mobile service, you agree to the Metro by T-Mobile Terms and Conditions ("T&Cs") which provide for arbitration of disputes. . . . See the complete T&Cs and opt-out details at metrobyt-mobile.com and return this device in accordance with the return policy at the place of purchase if you do not agree to the T&Cs.

*Id*. T-Mobile claims that on five occasions between July 2018 and August 2020, Polhill received a device that would have been sealed by the Metro Box Sticker. *Id.* at 5. In addition, Metro's standard practice and procedure is to send text messages to customers activating devices or lines notifying them of the T&Cs. *Id.* T-Mobile's records indicate that T-Mobile sent such text messages to Polhill on at least five occasions between July 2018 and August 2020. *Id.* (describing the text message template: "[Account #]: Please pay $[amount due] by [due date] to avoid service interruption. Metro by T-Mobile Terms & Conditions including arbitration apply. See mbyt-mo.com/terms.").

For his part, Polhill claims that he has "never knowingly accepted an arbitration agreement" with Metro or T-Mobile and that no one in the Metro store informed him that there were T&Cs on a website with an arbitration clause. Dkt. No. 20-1 at 2; *see also* Dkt. No. 33 at 3–4. Polhill further avers that he does not recall receiving a copy of any T&Cs or the Metro Information Sheet, or seeing the Metro Box Sticker, and that while he has received text messages mentioning the T&Cs and arbitration, he has never clicked on the link to view the T&Cs. Dkt. No. 20-1 at 2–3.

2. MetroPCS's T&Cs

Although Metro updated its T&Cs eight times between 2013 and 2022, Muzio attests that "the arbitration provisions have not changed in a way material to this dispute." *Id.* at 3–4; *see* Dkt.

Nos. 15-1–15-9.[5] In its motion, T-Mobile cites to the October 8, 2018 T&Cs "[f]or convenience," which Plaintiffs do not challenge or dispute. Dkt. No. 14 at 10 n.3; *see* Dkt. No. 15-6 at 2–8; *see generally* Dkt. Nos. 26, 28, 33. However, the March 2021 T&Cs are the version of the Metro T&Cs that were in place when the lawsuit was filed and that govern here. Dkt. No. 34 at 3. That iteration of the T&Cs substantively mirrors the language in the relevant T-Mobile T&Cs described above. *Compare* Dkt. No. 15-9 at 2–6, *with* Dkt. No. 27-5 at 2–7.[6] In addition, Muzio states that Metro's customer records reflect opt-out notices, and that Polhill has never provided notice that he would like to opt out of the arbitration agreement. Dkt. No. 15 at 6.

## II.   DISCUSSION

The two narrow issues before the Court are (1) did the parties form an agreement to arbitrate; and (2) if so, who decides arbitrability: the Court or an arbitrator? For the reasons laid out below, the Court concludes that the parties formed an agreement to arbitrate that delegates the question of arbitrability to an arbitrator.

### A.   Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims under the Federal Communications Act and the Computer Fraud and Abuse Act, *see* Dkt. No. 1 at 28–33, 40–41. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the dispute is between citizens of different states and the amount in controversy, exclusive of costs and interests, exceeds $75,000. T-Mobile is a Delaware corporation with its

---

[5] As the Court noted in its November 16, 2023 order, there appear to be "notable differences between the 2021 T&Cs and prior versions—including the 2018 Metro T&Cs[.]" Dkt. No. 29 at 3. Indeed, some contract language that T-Mobile quoted in support of its arguments is nowhere to be found in the T&Cs that T-Mobile contends were in force at the time Polhill experienced the SIM swap and sued. *Id.* The Court cautions T-Mobile that future misrepresentations of the evidence may result in sanctions.

[6] T-Mobile states that it revised the Metro T&Cs to conform with the language and format of the T-Mobile T&Cs in March 2021. Dkt. No. 34 at 4 n.1.

principal place of business in Bellevue, Washington, whereas Bennett and Polhill are citizens of Texas and Michigan, respectively. *Id.* at 5–6.

### B.   Legal Standard

Under the Federal Arbitration Act ("FAA"), courts must enforce a commercial agreement to "arbitrat[e] a controversy thereafter arising out of such contract[.]" 9 U.S.C. § 2. "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition" the district court for "an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* § 4. The FAA further provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" *Id.* § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned up).

When deciding whether to compel arbitration, a court must generally "determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)); *accord Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020). "However, these gateway issues can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably* provide otherwise.'" *Brennan*, 796 F.3d at 1130 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (courts should not assume, absent clear and unmistakable evidence, that the parties agreed to arbitrate arbitrability). Where, as here, the party opposing arbitration challenges both the formation of an agreement to arbitrate and the enforceability of a delegation clause, the Ninth

Circuit has outlined the proper order of operations:

> First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause. Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance.

*Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). Thus, "a court 'should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.'" *Id.* (emphasis omitted) (quoting *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010)).

The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). When deciding whether an agreement to arbitrate exists in the context of a motion to compel arbitration, district courts apply a "standard similar to the summary judgment standard of Federal Rule of Civil Procedure 56." *S.S. by & through Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1044 (S.D. Cal. 2021) (cleaned up). While "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," the Court will consider the substance of evidence so long as it may be admissible in another form at trial. *Id.* (quoting Fed. R. Civ. P. 56(c)(2)); *see also, e.g.*, *Harlow v. Chaffey Cmty. Coll. Dist.*, No. 21-55349, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022); *Mitchell v. Ecolab, Inc.*, No. 1:22-CV-01088-EPG, 2023 WL 2666391, at *4 (E.D. Cal. Mar. 28, 2023).

1    **C.      T-Mobile's Motion to Compel Arbitration**

2            T-Mobile asserts that Plaintiffs each agreed to T&Cs as part of their mobile phone services

3    that require them to arbitrate the claims alleged in the complaint, and that this action should

4    therefore be stayed pending arbitration. *See* Dkt. No. 14 at 9–13, 16–20, 25–27; Dkt. No. 21 at 7–

5    11, 17; Dkt. No. 26 at 4–7; Dkt. No. 34 at 3–7. T-Mobile also argues that the parties agreed to

6    delegate all disputes as to the scope, validity, and enforceability of the respective arbitration

7    agreements to the arbitrator in the first instance. Dkt. No. 14 at 20–26; Dkt. No. 21 at 11–16; Dkt.

8    No. 26 at 7–8.

9            Plaintiffs oppose T-Mobile's motion in its entirety. *See generally* Dkt. Nos. 20, 28. They

10   claim that T-Mobile has failed to meet its burden of showing the formation of an agreement to

11   arbitrate between Metro and Polhill, Dkt. No. 20 at 7–14; Dkt. No. 33 at 3–4, and that the relevant

12   arbitration clause does not cover Bennett's claims because she is not a signatory to T-Mobile's

13   T&Cs, Dkt. No. 28 at 6–8; Dkt. No. 33 at 3. Plaintiffs further argue that there is no clear and

14   unmistakable evidence of delegation in the purported agreements to arbitrate, Dkt. No. 20 at 16–

15   18 (Polhill); Dkt. No. 28 at 3–5 (Bennett), and that these agreements, including the delegation

16   clauses, are procedurally and substantively unconscionable, Dkt. No. 20 at 14–16, 18–19 (Polhill);

17   Dkt. No. 28 at 5–6 (Bennett).[7]

18

19

---

20   [7] In addition, Plaintiffs argue that T-Mobile waived its right to enforce the arbitration clauses in this case because it apparently did so in a different lawsuit. Dkt. No. 20 at 19–20; Dkt. No. 28 at 8; Dkt. No. 33 at 4–5. That argument

21   fails, however, as Plaintiffs provide no authority supporting the proposition that T-Mobile's conduct as a defendant in another matter can constitute waiver of its rights in *this* case. Moreover, the T&Cs expressly anticipate such a scenario,

22   further undermining Plaintiffs' assertion that T-Mobile's prior conduct in a collateral matter is inconsistent with its right to arbitrate in the instant action. *See* Dkt. No. 15-9 at 6 ("If we don't enforce our rights under any provisions of the Agreement in one instance, that doesn't mean we won't or can't enforce those rights in any other instance."); Dkt.

23   No. 27-5 at 32 (same); *cf. Cage v. Cach, LLC*, No. C13-01741-RSL, 2014 WL 2170431, at *1 (W.D. Wash. May 22, 2014). Furthermore, offensive non-mutual collateral estoppel can apply only where a defendant seeks to relitigate an

24   issue which "the defendant previously *litigated and lost* against another plaintiff." *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003) (emphasis added).

1.  <u>T-Mobile Has Sufficiently Established That Bennett Agreed to Arbitrate</u>

(a)      *New York Law Applies*

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options*, 514 U.S. at 944). Such agreements may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability[.]" *Concepcion*, 563 U.S. at 339 (quotation marks and citation omitted); *see* 9 U.S.C. § 2. The parties agree that New York law applies to the question of whether Bennett formed an agreement to arbitrate. *See* Dkt. No. 26 at 4; Dkt. No. 28 at 3. But the Court must still determine whether to apply the law of Washington, the forum state, or the law of New York, based on the T-Mobile T&Cs' choice of law provision indicating that the agreement is governed by "the laws of the state or jurisdiction in which your billing address in our records is located." Dkt. No. 27-5 at 30.

Federal courts sitting in diversity apply the substantive laws of the forum state, *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015), as do courts presiding over federal question actions involving supplemental jurisdiction over state law claims, *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009). Washington's choice of law rules require this Court to assess: (1) whether there is an actual conflict of laws between the two proposed states, and if so, (2) whether the choice of law provision in the relevant agreement is effective. *See, e.g.*, *Gierke v. Allstate Prop. & Cas. Ins. Co.*, No. C19-0071-JLR, 2019 WL 4849494, at *3 (W.D. Wash. Oct. 1, 2019) (citing *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120 (Wash. 2007)). Washington courts will enforce a choice of law provision unless a three-part test is satisfied: (1) "without the provision, Washington law would apply" under section 188 of the Restatement (Second) of Conflicts of Laws; (2) "the chosen state's law violates a fundamental public policy of

Washington"; and (3) "Washington's interest in the determination of the issue materially outweighs the chosen state's interest." *McKee v. AT & T Corp.*, 191 P.3d 845, 851 (Wash. 2008).

Here, the Court finds that there is no actual conflict between New York and Washington law regarding the formation of a contract that necessitates the application of Washington law in this instance. *See, e.g.*, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 290 n.7 (2d Cir. 2019). The Court therefore applies New York law pursuant to the T&Cs.

### (b) Bennett is Bound by T-Mobile's T&Cs

T-Mobile argues, and Plaintiffs do not appear to dispute, that Szteinhendler entered into a binding agreement to arbitrate disputes by signing the relevant account agreements and the receipt for the device purchased for Bennett's line, each of which incorporated the T-Mobile T&Cs. Dkt. No. 26 at 5; *see* Dkt. No. 27 at 2–4; Dkt. No. 27-1 at 2 (signed service terms); Dkt. No. 27-6 at 2–3 (signed iPhone receipt); Dkt. No. 27-7 at 2–10 (signed EIP). To the extent Bennett argues that she is not bound by the T-Mobile T&Cs because *she* did not sign the relevant agreements, Dkt. No. 28 at 4, 6; Dkt. No. 33 at 3, "[f]ederal courts have recognized that the obligation to arbitrate under the FAA does not attach only to one who has personally signed the arbitration provision." *Nguyen*, 763 F.3d at 1179 (citing *Thomson–CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). "Instead, a non-signatory to an arbitration agreement may be compelled to arbitrate where the nonsignatory knowingly exploits the benefits of the agreement and receives benefits flowing directly from the agreement." *Id.* (cleaned up); *see also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."); *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 272–75 (E.D.N.Y. 2019) (discussing traditional equitable estoppel and "direct benefits estoppel" whereby "a nonsignatory may be compelled to arbitrate where it knowingly accepts the benefits of an agreement with an arbitration

clause." (cleaned up)), *aff'd*, 815 F. App'x 612 (2d Cir. 2020); *Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1134 (N.Y. 2013).

T-Mobile's records show that regular monthly payments have been made on Szteinhendler's account from the time Bennett's phone line was activated in May 2019 through at least May 2023, Dkt. No. 27 at 5, and Bennett alleges in the complaint that she uses her T-Mobile line, Dkt. No. 1 at 18–19. Thus, because Szteinhendler opened and paid for Bennett's line of service, and Bennett received a "direct benefit" flowing from the agreement between Szteinhendler and T-Mobile, i.e., the use of her phone line and device, the Court concludes that she is bound by the T-Mobile T&Cs. *See Middleton v. T-Mobile US, Inc.*, No. 20-CV-3276 (NGG) (JRC), 2022 WL 16828226, at *9 (E.D.N.Y. Aug. 24, 2022); *Nicosia*, 384 F. Supp. 3d at 275.

2.   The Scope, Validity, and Enforceability of the T-Mobile Arbitration Agreement Must First Be Decided by an Arbitrator

A delegation clause is a clause within an arbitration provision that delegates to the arbitrator threshold questions of arbitrability, including whether the arbitration provision itself is enforceable. *Caremark*, 43 F.4th at 1029. After a court resolves challenges to the formation of an agreement to arbitrate, it must resolve challenges "directed specifically to the enforceability of the delegation clause[.]" *Id.* at 1030. And in order for a federal court to address an unconscionability challenge in the face of a delegation clause, a litigant opposing arbitration must specifically "argue that the agreement to delegate to an arbitrator his unconscionability claim was *itself* unconscionable." *Brennan*, 796 F.3d at 1133 (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 74 (2010)). The Ninth Circuit recently clarified that "to sufficiently challenge a delegation provision, the party resisting arbitration must specifically reference the delegation provision and make arguments challenging it," but that "a court need not . . . first evaluate the substance of the challenge." *Bielski v. Coinbase*, Inc., 87 F.4th 1003, 1011 (9th Cir. 2023). In addition, "a party

may use the same arguments to challenge both the delegation provision and arbitration agreement, so long as the party articulates why the argument invalidates each specific provision." *Id.*

(a)     Clear and Unmistakable Evidence of Delegation in T-Mobile's T&Cs

Plaintiffs argue that there is no clear and unmistakable evidence of delegation in the T-Mobile T&Cs, and that any such purported agreement is unconscionable. Dkt. No. 28 at 4–6; *see also* Dkt. No. 1 at 27 ("[T]o the extent the Terms of Service expressly or impliedly incorporates a 'delegation clause' that 'decides who decides' disputes, such delegation clause imposes an onerous, unfair, and unusual burden on users because the delegation clause itself is subject to the multi-step, onerous dispute resolution process in the Terms of Service."). However, despite Plaintiffs' contention to the contrary, the T-Mobile T&Cs contain clear and unmistakable evidence that disputes regarding the scope and enforceability of the arbitration clause have been delegated to an arbitrator to decide.

First, the T-Mobile T&Cs include notice of mandatory arbitration at the top of the agreement, as well as the following broad language regarding dispute resolution: "**ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, OUR SERVICES, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT**." Dkt. No. 27-5 at 2, 4–5. Second, the T&Cs incorporate by reference the rules of the American Arbitration Association ("AAA"). The T-Mobile T&Cs expressly provide that "[t]he arbitration of all disputes will be administered by the AAA under its Consumer Arbitration Rules in effect at the time the arbitration is commenced, except to the extent any of those rules conflicts [sic] with our agreement in these T&Cs, in which case these T&Cs will govern." *Id.* at 6; *see* Dkt. No. 16-1 at 18 (Rule 14(a) of the AAA's current Consumer Arbitration Rules providing that "[t]he arbitrator shall have the power to rule on his or

her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.").

The Ninth Circuit has held that incorporation of the AAA rules by reference often "constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130; *see also G.G. v. Valve Corp.*, 799 F. App'x 557, 558 (9th Cir. 2020). The Ninth Circuit has further expressed that such holding "should not be interpreted to require that the contracting parties be sophisticated or that the contract be 'commercial' before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent." *Brennan*, 796 F.3d at 1130.[8] Indeed, "[t]he parties' degree of sophistication does not change th[e] conclusion" that they clearly and unmistakably agreed to arbitrate questions of arbitrability in an arbitration agreement that incorporates AAA rules "because, under Washington law, '[c]ourts presume that parties to an agreement have read all parts of the entire contract and intend what is stated in its objective terms[.]'" *G.G.*, 799 F. App'x 557 at 558 (quoting *W. Coast Stationary Eng'rs Welfare Fund v. City of Kennewick*, 694 P.2d 1101, 1104 (Wash. Ct. App. 1985)); *see also Moreno v. T-Mobile USA, Inc.*, No. 2:22-CV-00843-JHC, 2023 WL 401913, at *4–5 (W.D. Wash. Jan. 25, 2023). So too in New York. *Marine Midland Bank, N.A. v. Embassy E., Inc.*, 553 N.Y.S.2d 767, 769 (N.Y. App. Div. 1990) ("[T]he law presumes that one who is capable of reading has read the document which he has executed[.]").

Here, the "arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318–19 (2d Cir. 2021). "[T]his—coupled with incorporation of rules that expressly empower an arbitrator to decide issues

---

[8] Plaintiffs do not provide any characterization of Bennett's sophistication level, but the Court presumes for the sake of argument that she is an average consumer.

of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* at 319; *see also, e.g.*, *Lewis v. Samsung Elecs. Am., Inc.*, No. 1:22-CV-10882 (JLR), 2023 WL 7623670, at *10–11 (S.D.N.Y. Nov. 14, 2023); *Kassim v. CVS Albany, LLC*, No. 21-CV-2927 (PKC) (TAM), 2022 WL 4357456, at *12 (E.D.N.Y. Sept. 20, 2022); *Esquer v. Educ. Mgmt. Corp.*, 292 F. Supp. 3d 1005, 1012–13 (S.D. Cal. 2017); *Capelli Enters., Inc. v. Fantastic Sams Salons Corp.*, No. 5:16-CV-03401-EJD, 2016 WL 4492588, at *4–5 (N.D. Cal. Aug. 26, 2016).

To avoid this result, Plaintiffs bizarrely argue that their claims do not arise out of the T&Cs and are instead based upon T-Mobile's alleged violations of state and federal statute, Dkt. No. 33 at 2, but their complaint asserts a breach of contract claim based on the T&Cs, Dkt. No. 1 at 38–40. Regardless, where—as here—the T&Cs delegate the arbitrability question to an arbitrator, the Court "possesses no power to decide the arbitrability issue" even if it believed "that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

Thus, "[i]n accordance with Supreme Court precedent," the Court is required to enforce the T&Cs "'according to their terms' and, in the absence of some other generally applicable contract defense, such as fraud, duress, or unconscionability, let an arbitrator determine arbitrability as to all but the claims specifically exempted by the [T&Cs]." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (quoting *Rent–A–Ctr.*, 561 U.S. at 67).

      (b)     *Plaintiffs Fail to Show That the T-Mobile T&Cs' Delegation Provision is Unconscionable*

The only remaining question with respect to Bennett is whether the delegation provision is itself unconscionable. *Brennan*, 796 F.3d at 1132. "[I]n order for a court to consider an unconscionability challenge to an arbitration provision, the challenging parties' argument must be

'specific to the delegation provision' in the arbitration provision." *Thomas v. Barclays Bank Del.*, No. C20-5937-JCC-MLP, 2021 WL 9649851, at *6 (W.D. Wash. Mar. 2, 2021) (quoting *Rent–A–Ctr.*, 561 U.S. at 73); *see also Bielski*, 87 F.4th at 1011.

With respect to Bennett, Plaintiffs argue that the T-Mobile T&Cs' arbitration clause is unconscionable, but only mention in passing the delegation clause, consistent with their position that the arbitration agreement lacks such a clause. Dkt. No. 28 at 5 ("[E]ven if there were a delegation clause found in the AAA Rules, such an arbitration agreement would be procedurally and substantively unconscionable."). Assuming without deciding that this qualifies as a proper challenge to the delegation provision, *Bielski*, 87 F.4th at 1011, Plaintiffs do not demonstrate that the T-Mobile T&Cs' delegation provision is so unconscionable so as to render the clause unenforceable in this case.

Under New York law, "a provision in an arbitration agreement is unconscionable if 'it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" *Glover v. Bob's Disc. Furniture, LLC*, 621 F. Supp. 3d 442, 449 (S.D.N.Y. 2022) (quoting *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010)). Generally, this requires a showing of both procedural and substantive unconscionability. *Id.*; *see also Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 525 (E.D.N.Y. 2017).

Here, Plaintiffs argue that "the arbitration clause is a contract of adhesion that gives T-Mobile a 60-day 'free peek' at the consumer's claim without tolling the limitation period," and that "T-Mobile can unilaterally change the arbitration agreement 'at any time[.]'" Dkt. No. 28 at 5. Plaintiffs also contend that the arbitration agreement is unconscionable because T-Mobile can "force the consumer to re-file his action in small claims court before an arbitrator is appointed" and because the T&Cs "limit the arbitrator's power to award damages against T-Mobile." *Id.* at 5–

6.

Beginning with Plaintiffs' claims of procedural unconscionability, "even if the Agreement was a form contract offered on a 'take-it-or-leave-it' basis and [defendant] refused to negotiate the Arbitration Provision, this is not sufficient under New York law to render the provision procedurally unconscionable." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009). "In finding contractual provisions procedurally unconscionable, courts look for high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties." *McDougall v. Samsung Elecs. Am., Inc.*, No. 23-CV-168 (LGS), 2023 WL 6445838, at *6 (S.D.N.Y. Oct. 3, 2023) (cleaned up). Plaintiffs have submitted no such evidence here. *See, e.g.*, *Perry v. MLB Advanced Media, L.P.*, No. CV-18-1548-PSG (GJSx), 2018 WL 5861307, at *4–6 (C.D. Cal. May 30, 2018) (applying New York law and denying procedural unconscionability challenge).

Likewise, with respect to substantive unconscionability, "[t]he unilateral right to modify an agreement, without more, does not render the agreement unenforceable." *Nicholas v. Wayfair Inc.*, 410 F. Supp. 3d 448, 456 (E.D.N.Y. 2019). As for Plaintiffs' "free peek" argument, the Ninth Circuit recently considered this and several of Plaintiffs' other unconscionability arguments under California law and declined to find the relevant delegation provision unenforceable. *See Bielski*, 87 F.4th at 1013–15. And New York courts have rejected similar arguments, holding that the requirement to "divulge all of [the plaintiff's] claims first to the entity against whom he/she is complaining about" is not by itself unconscionable. *Brown v. Coca-Cola Enterprises, Inc.*, No. 08-CV-3231-JFB-ETB, 2009 WL 1146441, at *9 (E.D.N.Y. Apr. 28, 2009). In addition, whatever advantage results from the ability to initiate small claims proceedings before an arbitrator is selected is a two-way street: both Bennett and T-Mobile have this right under the T&Cs. In any event, Plaintiffs have not demonstrated that Bennett is likely to be forced to incur the cost of re-

filing in small claims court. *See Perry*, 2018 WL 5861307, at *6; *see also M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (a forum selection clause "should control absent a strong showing that it should be set aside," such as a clear showing "that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching").

The limitation of liability clause Bennett highlights in the T-Mobile T&Cs does not mention negligence, and instead limits T-Mobile's liability for "problems caused by" the user or by third parties, without precluding liability for negligence attributable to T-Mobile. Dkt. No. 27-5 at 32. Moreover, "there is nothing inherently suspect about a limitation of liability clause; New York courts consistently uphold them when they do not otherwise violate public policy." *Yuille v. Uphold HQ Inc.*, No. 22-CV-7453 (LJL), 2023 WL 5206888, at *18 (S.D.N.Y. Aug. 11, 2023). "The parties may later regret their assumption of the risks of non-performance in this manner, but the courts let them lie on the bed they made, unless the provision is the result of unconscionable conduct or unequal bargaining power between the parties." *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006) (cleaned up). Plaintiffs do not point to any liability-limiting term that "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforc[ea]ble according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (N.Y. 1988) (quoting *Mandel v. Liebman*, 303 N.Y. 88, 94 (N.Y. 1951)). And finally, the clause contains a disclaimer that it applies only "[t]o the extent permitted by law[.]" Dkt. No. 27-5 at 32.

Thus, the Court does not find a level of substantive unconscionability in the clauses discussed above that renders the delegation clause unenforceable. And in the absence of a sufficient showing of procedural and substantive unconscionability, the Court concludes that the delegation clause is enforceable and that Bennett must proceed to arbitration. *See, e.g.*, *Caremark*, 43 F.4th at 1029 ("Under *Rent-A-Center* . . . a valid—*i.e.*, enforceable—delegation clause commits

to the arbitrator nearly all challenges to an arbitration provision." (footnote omitted)); *Rodriguez v. T-Mobile USA, Inc.*, No. 22-CV-00581-AJB-DEB, 2023 WL 6593786, at *3–4 (S.D. Cal. Sept. 28, 2023).

### 3.   T-Mobile Has Sufficiently Established That Polhill Agreed to Arbitrate

#### (a)   *Michigan Law Applies*

Turning to Polhill, the Court again begins by applying ordinary state-law principles governing the formation of contracts to determine whether T-Mobile has sufficiently established the existence of an agreement to arbitrate. *Nguyen*, 763 F.3d at 1175. Like the T-Mobile T&Cs, the Metro T&Cs include a choice of law provision. Dkt. No. 15-9 at 6. The parties agree that Michigan law applies to the question of whether Polhill formed an agreement to arbitrate. Dkt. No. 14 at 16–17; Dkt. No. 20 at 9. And the Court finds that there is no actual conflict between Michigan and Washington law regarding the formation of a contract that necessitates the application of Washington law in this instance.

Under Washington law, the parties must objectively manifest their mutual assent to sufficiently definite terms, and the contract must be supported by consideration. *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004); *see also New York Life Ins. Co. v. Mitchell*, 528 P.3d 1269, 1280 (Wash. 2023) ("[A]ll parties must have the requisite legal capacity to create a valid contract."); *cf. Ekin v. Amazon Servs.*, LLC, 84 F. Supp. 3d 1172, 1176 (W.D. Wash. 2014) ("In Washington, a contract is illusory only if it lacks all consideration and mutuality of obligation, e.g., the promisor has no obligations with regard to any parts of the contract." (emphasis omitted)). Under Michigan law, "[a] valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich. v. State of Michigan*, 866 N.W.2d 782, 804 (Mich. 2015). The Court therefore applies Michigan law pursuant to the T&Cs. *See In re*

1  *StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 881 n.4 (6th Cir. 2021) (applying the

2  parties' choice of law provision); *Thomas*, 2021 WL 9649851, at *4 (same); *Schnall v. AT & T*

3  *Wireless Servs., Inc.*, 259 P.3d 129, 131–33 (Wash. 2011) (same).

4           Plaintiffs do not dispute that Polhill and T-Mobile were competent to contract or that

5  arbitration is a proper subject matter. Nor do Plaintiffs dispute that Polhill agreed to pay Metro for

6  devices and cellular service. *See* Dkt. No. 20 at 10 (acknowledging that Metro and T-Mobile

7  "reached an agreement, whether express or implied, with Mr. Polhill about his phone purchase and

8  cellular service"). Rather, Plaintiffs argue that Polhill never accepted the arbitration agreement and

9  that the agreement lacks mutuality of obligation. *Id.* at 10–14; *see In re StockX*, 19 F.4th at 881.

10 Applying Michigan law pursuant to the T&Cs, the Court finds that Polhill formed an agreement

11 to arbitrate.

12           *(b)      The Muzio Declaration is Admissible*

13           The Court first addresses Plaintiffs' evidentiary challenge to Muzio's declaration. In light

14 of the absence of a written agreement signed by Polhill, Plaintiffs challenge the admissibility of

15 Muzio's testimony regarding Metro's standard practices and procedures as a way of proving the

16 existence of an agreement to arbitrate. *See* Dkt. No. 20 at 7–9; *id.* at 7 ("The Muzio declaration's

17 conclusory statements about routine practices by MetroPCS are inadmissible to prove Mr. Polhill

18 ever received or accepted the T&Cs with an arbitration clause."); *see also* Dkt. No. 33 at 3–4.

19 Plaintiffs' arguments are unavailing. First, this case is distinguishable from *Johnson v. Stellar*

20 *Recovery, Inc.*, No. 13-13829, 2014 WL 5705027 (E.D. Mich. Nov. 5, 2014), the main case on

21 which they rely. In that case, the court found that Muzio's declaration failed to include details "as

22 to any routine practice under which Plaintiff would have been presented with the Terms and

23 Conditions." *Id.* at *7. Here, however, Muzio's declaration offers specific context as to Metro's

24 routine practices and procedures, including with respect to the sharing of the T&Cs upon

activation, the Metro Information Sheet, the Metro Box Sticker, and the text messages sent mentioning the arbitration agreement. Dkt. No. 15 at 3–5. Moreover, Plaintiffs do not contend that Muzio's testimony regarding Metro's routine practices "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also* Fed. R. Evid. 406, 803(6), 902(11); *Stratton v. Portfolio Recovery Assocs., LLC*, 706 F. App'x 840, 844 (6th Cir. 2017) (agreement between debtor and creditor was admissible despite lack of debtor's signature on the agreement under Federal Rule of Evidence 803(6) where custodian attested to the routine procedures the creditor followed in obtaining a document from an original creditor); *Lopez v. Cequel Commc'ns, LLC*, No. 2:20-CV-02242-TLN-JDP, 2021 WL 5112982, at *3 & n.4 (E.D. Cal. Nov. 3, 2021) (finding admissible broadband provider employee's declaration attesting to provider's routine practices relating to its residential services agreement); *S.S. by & through Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1045–46 (S.D. Cal. 2021) (finding admissible Peloton's senior product manager's declaration attesting to Peloton's routine practices relating to its Terms of Service). Accordingly, the Court considers Muzio's declaration.

### (c)     *T-Mobile Has Demonstrated Mutuality of Assent*

"Whether the parties have mutually agreed to be bound 'is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.'" *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (quoting *Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006)). While a signed agreement shows mutual assent, the failure of one or both parties to sign a written agreement does not necessarily mean that a contract has not been formed. *Ehresman v. Bultynck & Co., PC*, 511 N.W.2d 724, 726 (Mich. Ct. App. 1994); *see also Sanchez v. Eagle Alloy Inc.*, 658 N.W.2d 510, 517 (Mich. Ct. App. 2003) ("A meeting of the minds can be found from performance and acquiescence in that performance.").

Considering Muzio's testimony regarding Metro's standard practice of delivering the T&Cs in multiple formats, and Polhill's corresponding conduct over a nine-year period—i.e., purchasing multiple devices and services and never attempting to opt out—the Court finds that T-Mobile has met its initial burden of establishing that Polhill consented to the Metro T&Cs, including the arbitration agreement. *See, e.g.*, *Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013) (finding in the employment context that plaintiff's "conduct following the communication of the offer objectively suggests that she accepted the arbitration agreement by continuing her employment without returning an opt-out form" because "[t]his performance mirrors that called for in the offer"); *Shye v. Bookspan LLC*, No. 1:21-CV-12285, 2022 WL 721525, at *5 (E.D. Mich. Mar. 9, 2022) (concluding that defendant met its initial burden where defendant's executive vice president submitted declarations attesting to defendant's relevant business practices of informing individuals that by signing up for its services, they would also be agreeing to defendant's terms and conditions); *Cuadras v. MetroPCS Wireless, Inc.*, No. CV-09-7897-CAS (AJWx), 2011 WL 11077125, at *6 (C.D. Cal. Aug. 8, 2011) (holding that evidence of Metro's standard business practice of providing consumers with a copy of its T&Cs upon initiating service, "along with the fact that plaintiff activated lines of service on four separate occasions," was sufficient to satisfy Metro's initial burden of showing an agreement to arbitrate).

The Court next turns to whether Polhill has adequately disputed T-Mobile's proffered evidence of an agreement to arbitrate. In *Boykin v. Family Dollar Stores of Michigan, LLC*, the Sixth Circuit addressed the ways in which a plaintiff may establish a genuine dispute over whether he accepted an agreement to arbitrate. 3 F.4th 832, 839–40 (6th Cir. 2021); *id.* at 839 (identifying the "recurring question about what kinds of 'denials' create a genuine dispute of fact"). The court explained that "convenient memory lapses do not create factual disputes that are genuine," and that a party "cannot expect to obtain a trial under § 4 [of the FAA] simply by testifying that the

party does not 'remember' signing an arbitration contract or receiving information about arbitration." *Id.* at 839–40. In contrast, "an 'unequivocal denial' that takes the form of admissible 'evidence' can create a genuine dispute of fact." *Id.* at 840 ("[A] party might be able to obtain a trial under § 4 with a sworn denial that the party ever signed an arbitration agreement or received arbitration materials.").

Although Polhill has submitted a sworn declaration, it is not an unequivocal denial that he ever received information about Metro's arbitration clause. Rather, Polhill attests that he has never "knowingly" accepted an arbitration agreement, that he does not "recall receiving" the Metro T&Cs or Metro Information Sheet, or "recall seeing" the Metro Box Sticker "or other document mentioning arbitration when purchasing [his] phone[.]" Dkt. No. 20-1 at 2. He further avers that he "likely was not present" when the devices purchased in association with his account were taken out of the box. *Id.* And while he admits he received Metro's text messages expressly referencing the T&Cs and arbitration, he has "no particular recollection" of receiving "other kinds of text messages" from Metro and has "never clicked on a link in a text message that claims to go to purported [T&Cs] for [his] service with Metro[.]" *Id.* at 3. These irresolute assertions fail to constitute the unequivocal denial required to establish a genuine dispute of fact. *See, e.g.*, *Cuadras*, 2011 WL 11077125, at *6 ("[N]o rational trier of fact would be able to find that plaintiff did not receive the T & Cs when she activated her lines of service.").[9]

In sum, T-Mobile has shown that (1) Metro provided notice to Polhill that by activating or

---

[9] Though Plaintiffs argue in opposition to T-Mobile's motion that Polhill "never received notice of or a copy of the T&Cs or an arbitration agreement when he activated his service with MetroPCS/T-Mobile," they cite to no evidence in the record either supporting that assertion or rebutting T-Mobile's evidence of its policy and practice of providing the T&Cs as outlined in Muzio's declaration. Dkt. No. 20 at 9. At one point Plaintiffs assert that Polhill "did not see" the Metro Box Stickers, *id.* at 12, but Polhill's declaration states only that he does not "*recall* seeing" the Metro Box Stickers, Dkt. No. 20-1 at 2 (emphasis added). A party claiming that a fact is genuinely disputed must support that assertion by "citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A). Plaintiffs are warned that future misrepresentations of the evidence may result in sanctions.

continuing his service, he was consenting to the Metro T&Cs, and (2) he nevertheless remained a customer for nearly a decade, purchasing several devices without attempting to opt out of the arbitration agreement. *See Shye*, 2022 WL 721525, at *5 ("Under Michigan law, Plaintiff's conduct demonstrates h[is] assent to the terms and conditions of the membership agreement."). Furthermore, Polhill's inability to recall whether he received the Metro Information Sheet, saw the Metro Box Sticker, or otherwise became aware of the Metro T&Cs qualifies as the type of "convenient memory lapse" that is insufficient to generate a dispute of fact. *Boykin*, 3 F.4th at 839. Further, Polhill's failure to click on the link to the Metro T&Cs that he acknowledges receiving via text is similarly insufficient. *See In re StockX*, 19 F.4th at 882 ("It was plaintiffs' duty to read the contract and obtain an explanation if they did not understand it." (cleaned up)). Thus, the Court finds there was mutuality of assent regarding the arbitration agreement.

### (d)   T-Mobile Has Demonstrated Mutuality of Obligation

Next, Plaintiffs argue that T-Mobile has failed to meet its burden of establishing an agreement to arbitrate because the Metro T&Cs lack "mutuality of obligation" under Michigan law. Dkt. No. 20 at 13–14. Specifically, Plaintiffs aver that because "T-Mobile can unilaterally change what it contends is a contract, including the arbitration clause," the T&Cs "cannot form a contract under Michigan law." *Id.* at 14. The Court disagrees.

"Mutuality of obligation means that both parties to an agreement must be bound by the contract, or neither is bound." *Eichinger v. Kelsey-Hayes Co.*, No. 09-14092, 2010 WL 2720931, at *6 (E.D. Mich. July 8, 2010); *see also id.* ("Where a contract obligates only one party to perform, while exempting the other party from any obligation to do so, it lacks mutuality and is void for want of consideration." (cleaned up)); *Salita Promotions Corp. v. Ergashev*, No. 20-12547, 2021 WL 3510967, at *8 (E.D. Mich. Aug. 10, 2021) ("The key feature of an illusory contract is that there is no mutuality of obligation."). In this case, the arbitration clause binds both Metro and

Polhill. *See, e.g.*, Dkt. No 15-9 at 2 ("You and we each agree that, except as provided below, any and all claims or disputes in any way related to or concerning the agreement, our privacy notice, our services, devices or products, including any billing disputes, will be resolved by binding arbitration or in small claims court." (emphasis and capitalization omitted)).

Plaintiffs are correct that the T&Cs outline Metro's right to make changes to the agreement. However, Plaintiffs fail to show how these provisions create an illusory agreement or make Metro any less bound than Polhill. For example, the terms in effect at the time he signed up for service informed him that if T-Mobile made changes to the agreement, he would be "notified at least ten (10) days, unless a longer period is required, in advance of any proposed changes that may result in more restrictive terms or conditions in this Agreement," and that he could "refuse to accept the changes" by notifying T-Mobile "within ten (10) days of the date of the change notice that [he] wish[ed] to terminate service." Dkt. No. 15-1 at 7 (capitalization omitted). Similarly, the 2021 T&Cs state as follows:

> **CAN METRO BY T-MOBILE CHANGE OR TERMINATE MY SERVICES OR THIS AGREEMENT?**
> Yes. We may change, limit, suspend or terminate your Service or this Agreement at any time . . . . If the change to your Service or Rate Plan will have a material adverse effect on you, we will provide 14 days' notice of the change. You'll agree to any change by using your Service after the effective date of the change.

Dkt. No. 15-9 at 4–5. Therefore, the Court finds that T-Mobile has demonstrated mutuality of obligation. *See, e.g.*, *Salita Promotions*, 2021 WL 3510967, at *8 ("[A] right to amend does not render an agreement illusory when restrictions are placed on that right." (internal quotation marks omitted) (quoting *Tobel v. AXA Equitable Live Ins. Co.*, No. 298129, 2012 WL 555801, at *4 (Mich. Ct. App. Feb. 21, 2012))).

Having found that T-Mobile has satisfied its burden of establishing an agreement to arbitrate, the Court turns to Plaintiffs' challenge to the enforceability of any delegation clause in

1    the Metro T&Cs. *See Caremark*, 43 F.4th at 1030.

2        4.   The Scope, Validity, and Enforceability of the Metro Arbitration Agreement Must
             First Be Decided by an Arbitrator

3

4        As with the T-Mobile T&Cs, Plaintiffs argue that there is no clear and unmistakable

5    evidence of delegation in the Metro T&Cs, and that any such purported agreement is

6    unconscionable. Dkt. No. 20 at 14–19. For the same reasons discussed above in relation to Bennett,

7    the Court disagrees.

8        (a)   *Clear and Unmistakable Evidence of Delegation in Metro's T&Cs*

9        As with Bennett, there is clear and unmistakable evidence of an intent to delegate disputes

10   between Polhill and Metro as to arbitrability to the arbitrator.

11       First, the governing 2021 T&Cs explicitly state that "any and all disputes in any way related

12   to or concerning" Metro's agreement, services, devices, or products "will be resolved by binding

13   arbitration[.]" Dkt. No. 15-9 at 2. Plaintiffs contend that language to this effect in the 2018 T&Cs

14   "is not 'clear and unmistakable' because it is undercut when the agreement later provides that a

15   'court of competent jurisdiction' is in charge of finding a new arbitration administrator if Metro's

16   agreement will not be enforced 'as written' by the American Arbitration Administration." Dkt. No.

17   20 at 18; *see* Dkt. No. 15-6 at 3 ("If the arbitration administrator will not enforce this arbitration

18   agreement as written, the parties shall agree on or mutually petition a court of competent

19   jurisdiction to appoint a substitute arbitration administrator who will do so"). But such conditional

20   language is not included in the governing 2021 T&Cs, *see generally* Dkt. No. 15-9, and even if it

21   were, it in no way undermines or conflicts with the clear language delegating to the arbitrator

22   disputes regarding the enforceability of the arbitration agreement.

23       Second, the T&Cs incorporate by reference the rules of the AAA. Dkt. No. 15-9 at 2; *see*

24   *also* Dkt. No. 16-1 at 18 (Rule 14(a) of the AAA's current Consumer Arbitration Rules). Plaintiffs

claim that incorporation of the AAA's rules is insufficient to constitute clear and unmistakable evidence of the parties' intent to delegate gateway issues to the arbitrator. Dkt. No. 20 at 17 ("Consumers cannot be expected to locate this reference to (future) arbitration rules, locate the current copy of the arbitration rules, find the specific rule governing the arbitrator's jurisdiction, and then understand its importance for questions of validity[.]"). But as noted above, the T&Cs' incorporation of the AAA rules "constitutes clear and unmistakable evidence" of such intent, *Brennan*, 796 F.3d at 1130, and "nothing in the Federal Arbitration Act purports to distinguish between 'sophisticated' and 'unsophisticated' parties," *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 851 (6th Cir. 2020).[10] And like in New York and Washington, under Michigan law, a party to a contract is presumed to have read it, and "[i]t is well established that failure to read an agreement is not a valid defense to enforcement of a contract." *Montgomery v. Fid. & Guar. Life Ins. Co.*, 713 N.W.2d 801, 804 (Mich. Ct. App. 2005). Thus, the Court finds that as with the 2021 T-Mobile T&Cs, the broad arbitration agreement coupled with the incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability to an arbitrator. *DDK Hotels*, 6 F.4th at 318–19; *Blanton*, 962 F.3d at 846.

Accordingly, the Court is required to enforce the Metro T&Cs according to their terms unless some other defense, such as unconscionability, applies. *Mohamed*, 848 F.3d at 1209.

(b)     *Plaintiffs Fail to Show That the Metro T&Cs' Delegation Provision is Unconscionable*

Plaintiffs maintain that the delegation clause itself is procedurally and substantively unconscionable. Dkt. No. 20 at 18 ("Procedurally, the delegation clause was imposed on customers

---

[10] Plaintiffs do not provide any characterization of Polhill's sophistication level, but the Court presumes for the sake of argument that he is an average consumer.

in the same coercive, deceptive process as the arbitration agreement itself. . . . Substantively, the delegation clause is the source of many unconscionable provisions identified above with respect to the unconscionability of the arbitration agreement as a whole."); *see also id.* at 14–15. T-Mobile asserts that despite referencing the delegation clause by name, Plaintiffs do not meaningfully challenge its operation and instead target the T&Cs in general. Dkt. No. 14 at 23–24 ("[W]hether the dispute resolution provision in the arbitration provision is 'onerous' or 'unfair,' as [Polhill] alleges, has no bearing on whether it is unconscionable to delegate arbitrability disputes to the arbitrator."); *see also* Dkt. No. 21 at 14 ("[A] party cannot challenge a delegation clause based on the argument that a *different* procedural provision, like a pre-arbitration dispute resolution provision, is unconscionable." (emphasis original)). In any event, T-Mobile argues that the delegation clause is not procedurally and substantively unconscionable. *See* Dkt. No. 21 at 13–16.

Under the Ninth Circuit's recent holding in *Bielski*, the Court finds that Plaintiffs have lodged a proper unconscionability challenge to the delegation clause. 87 F.4th at 1011.[11] Even still, Plaintiffs do not demonstrate that the Metro T&Cs' delegation provision is sufficiently unconscionable so as to render the clause unenforceable in this case.

For a contract or contractual provision to be considered unconscionable under Michigan law, "both procedural and substantive unconscionability must be present." *Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471, 474 (Mich. Ct. App. 2005); *accord Lebenbom v. UBS Fin. Servs., Inc.*, 926 N.W.2d 865, 873–74 (Mich. Ct. App. 2018). "Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term," and substantive unconscionability "exists where the challenged term is not substantively reasonable," meaning "the inequity of the term is so extreme as to shock the conscience." *Clark*, 706 N.W.2d

---

[11] The Court notes that T-Mobile submitted its briefing prior to the Ninth Circuit's December 2023 decision in *Bielski*.

at 474–75. In this instance, for similar reasons addressed above in relation to Bennett, the Court is not persuaded by Plaintiffs' unconscionability arguments that Polhill had no realistic alternative but to accept the delegation provision and that the delegation provision itself shocks the conscience. *See, e.g.*, *Bielski*, 87 F.4th at 1013–15.

For example, Plaintiffs do not dispute that the T&Cs contain an opt out provision for the arbitration agreement, including the delegation clause, but instead argue that it is "practically impossible to comply with[.]" Dkt. No. 20 at 15 ("The provision makes it impossible for Mr. Polhill or other customers to opt-out because the opt-out deadline passes before the customer ever finds out about the arbitration agreement."). However, Plaintiffs fail to support their assertion that the 30-day opt-out window (Dkt. No. 15-1 at 3) is procedurally unconscionable. *See, e.g.*, *Rodriguez*, 2023 WL 6593786, at *3 ("There is no oppression present here because although the contract is one of adhesion, the arbitration agreement clearly provided Plaintiffs with an option to opt-out of arbitration, and there is no indication that Plaintiffs lacked reasonable market alternatives such that there was an absence of meaning choice."); *Zawada v. Uber Techs., Inc.*, No. 16-CV-11334, 2016 WL 7439198, at *6–7 (E.D. Mich. Dec. 27, 2016), *aff'd*, 727 F. App'x 839 (6th Cir. 2018). And even if there were a basis to find a degree of procedural unconscionability, "there is nothing in the plain language of the arbitration clause that leads [the Court] to conclude that it is so extreme that it can be said to be substantively unconscionable." *Lebenbom*, 926 N.W.2d at 874 (cleaned up). Moreover, as noted above, Ninth Circuit recently considered the "free peek" argument the Plaintiffs rely on and found that such provisions were not "overly harsh or unfairly one-sided." 87 F.4th at 1015; *see also Barr v. HSS, Inc.*, No. 17-CV-12820, 2018 WL 8222120, at *8 (E.D. Mich. May 10, 2018) (finding similar arbitration process was not unconscionable), *report and recommendation adopted in relevant part*, 2018 WL 3545118 (E.D. Mich. July 24, 2018); *Eichinger v. Kelsey-Hayes Co.*, No. 09-14092, 2010 WL 2720931, at *7 (E.D. Mich. July 8, 2010)

1    (same).

2         Accordingly, the Court concludes that Polhill must also proceed to arbitration.[12]

3    ### III.   CONCLUSION

4         For the foregoing reasons, the Court GRANTS T-Mobile's Motion to Compel Arbitration

5    and Stay Proceedings. Dkt. No. 14. The Court STAYS these proceedings pending arbitration. The

6    parties are DIRECTED to file a joint status report within ten days of the completion of arbitration

7    proceedings.

8         Dated this 22nd day of January, 2024.

9

10   Lauren King
     United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24   [12] The parties do not appear to dispute that, to the extent Plaintiffs' claims are arbitrable, the T&Cs bar class arbitration. Dkt. No. 15-9 at 3; Dkt. No. 27-5 at 7; *see Shivkov v. Artex Risk Sols.*, Inc., 974 F.3d 1051, 1067 (9th Cir. 2020).

ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY CASE - 31